991 F.2d 458
 36 ERC 1452, 23 Envtl. L. Rep. 20,944
 NORTHERN STATES POWER COMPANY, Plaintiff-Appellee,
v.
The PRAIRIE ISLAND MDEWAKANTON SIOUX INDIAN COMMUNITY,
Defendant-Appellant,
The Tribal Council of the Community; Dale R. Childs;
Richard Buck; Johnny Johnson; Vine H. Wells; Jim White,
all in their Official Capacity; Bureau of Indian Affairs,
Minneapolis Area Office; The Interior Board of Indian
Appeals; United States of America, Defendants.
NORTHERN STATES POWER COMPANY, Plaintiff-Appellee,
v.
The PRAIRIE ISLAND MDEWAKANTON SIOUX INDIAN COMMUNITY; The
Tribal Council of the Community; Dale R. Childs;
Richard Buck; Johnny Johnson; Vine H.
Wells; Jim White;
Defendants-Appellants,
Bureau of Indian Affairs; The Interior Board of Indian
Appeals; United States of America, Defendants.
 Nos. 92-1240, 92-1476.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 9, 1992.
Decided April 14, 1993.
 
 William J. Hardacker, Bloomington, MN, argued (Kurt V. BlueDog and Andrew M. Small, on brief), for appellants.
 Timothy Thornton of Minneapolis, MN, argued (Michael J. Ahern, Peter A. Koller and Maureen A. Scott, on brief), for appellee.
 Before JOHN R. GIBSON and MAGILL, Circuit Judges, and VAN SICKLE,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The Prairie Island Mdewakanton Sioux Indian Community (tribe) and its Tribal Council appeal from a preliminary injunction entered against the enforcement of a tribal nuclear radiation control ordinance requiring transporters to obtain a tribal license for each shipment of nuclear materials across reservation land. Northern States Power Company (NSP) brought this action, seeking a declaratory judgment that the tribal ordinance is preempted by the Hazardous Materials Transportation Act. The district court[1] granted the preliminary injunction, Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community, 781 F.Supp. 612, 618-19 (D.Minn.1991), and the tribe appealed, arguing that tribal sovereign immunity bars the action, that the district court erred in not requiring NSP to exhaust tribal remedies, and that the district court erred in entering the preliminary injunction. We affirm the judgment of the district court.
 
 
 2
 NSP has operated its Prairie Island nuclear plant since 1974. The Prairie Island plant is near the Prairie Island Indian Community Reservation and the only current ground access to the plant is provided by a railroad line and a county road, both of which cross the reservation. 781 F.Supp. at 613. In the course of normal operations, NSP moves approximately seventy shipments of nuclear materials in or out of the plant each year.[2]
 
 
 3
 On July 16, 1991, the Tribal Council enacted a nuclear radiation control ordinance which regulated the transportation of nuclear materials on reservation land. Id. The ordinance required that transporters obtain a separate tribal license for each shipment of nuclear material. Id. at 613. The ordinance also required that license applications be filed 180 days in advance of each shipment, and be accompanied by an application fee of $1,000. Id. at 613-14. The ordinance also gave the Tribal Council authority to determine whether to issue a license, and to impose a $1,000,000 civil fine for willful violations of the ordinance. Id. at 614.
 
 
 4
 As the tribe's constitution required, the Bureau of Indian Affairs reviewed the ordinance and initially approved it. Id. at 614. NSP appealed this ruling to the Interior Board of Indian Appeals. Id. On November 19, 1991, while the appeal was pending, the Tribal Council formally resolved to fully enforce the ordinance. Id. NSP then asked the Interior Board of Indian Appeals to order the Tribal Council to cease and desist enforcement of the ordinance. Id. The Interior Board concluded that it lacked authority to enjoin a tribe from enforcing a tribal ordinance and reinstated the Bureau's initial approval. Id. at 614-15. NSP then brought this action for declaratory judgment. Id. at 615.
 
 
 5
 The district court conducted a hearing on the motion for a temporary restraining order, granted the motion, obtained further briefing, and heard oral argument on the motion for a preliminary injunction. Id. The district court denied the tribe's motion to dismiss, entered an order preliminarily enjoining any enforcement of the ordinance or any interference with the use of the road or railroad line through the reservation, and stayed the Bureau's initial approval. Id. at 618-19. The tribe and its individual council members appealed.
 
 
 6
 The tribe argues that the district court erred in failing to recognize and apply principles of tribal sovereignty, including the tribe's immunity from suit pending exhaustion of tribal court remedies, and that the district court erred in its analysis of the four factors that govern the issuance of preliminary injunctive relief. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir.1981) (en banc).
 
 I.
 
 7
 We first address the tribe's argument that the district court erred in denying the tribe's motion to dismiss. The tribe argues that tribal sovereign immunity precludes the suit and protects the tribal officers. In dismissing the tribe's motion, the district court focused on the issue of the ordinance's likely preemption by federal statute and ruled that sovereign immunity did not protect the tribal officers because they had acted beyond the scope of the authority the tribe was capable of bestowing upon them. 781 F.Supp. at 617-18.
 
 
 8
 The protection of sovereign immunity is subject to the well established exception described in Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 453-54, 52 L.Ed. 714 (1908). Ex parte Young applies to the sovereign immunity of Indian tribes, just as it does to state sovereign immunity. See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 514, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991). The Tenth Circuit applied this exception in Tenneco Oil Co. v. Sac and Fox Tribe of Indians, 725 F.2d 572, 574 (10th Cir.1984).
 
 
 9
 The situation is different, however, when the law under which the official acted is being questioned.... When the complaint alleges that the named officer defendants have acted outside the amount of authority that the sovereign is capable of bestowing, an exception to the doctrine of sovereign immunity is invoked.... If the sovereign did not have the power to make a law, then the official by necessity acted outside the scope of his authority in enforcing it, making him liable to suit.
 
 
 10
 Id. (citations omitted).
 
 
 11
 In the November 19, 1991 resolution, the tribal officers clearly indicated their intent to enforce the ordinance. See 781 F.Supp. at 614. If the tribe did not have the power to enact this ordinance, then the tribal officers were not clothed with the tribe's sovereign immunity. Both NSP and the United States (as amicus curiae) argue that the tribe lacks the power to enact the ordinance because it is preempted by the Hazardous Materials Transportation Act, 49 U.S.C.A.App. §§ 1801-1819 (West Supp.1992).[3] The sole question before us then is whether this particular ordinance runs afoul of the Act's preemption rules.
 
 
 12
 The Hazardous Materials Transportation Act provides that:
 
 
 13
 (a) In general
 
 
 14
 Except as provided, in subsection (d) of this section and unless otherwise authorized by Federal law, any requirement of a State or political subdivision thereof or Indian tribe is preempted if(1) compliance with both the State or political subdivision or Indian tribe requirement and any requirement of this chapter or of a regulation issued under this chapter is not possible,
 
 
 15
 (2) the State or political subdivision or Indian tribe requirement as applied or enforced creates an obstacle to the accomplishment and execution of this chapter or the regulations issued under this chapter ...
 
 
 16
 49 U.S.C.A.App. § 1811(a)(1)-(2) (West Supp.1992). These preemption rules took their present form in 1990 when Congress amended the Act. Congress specifically found that:
 
 
 17
 (3) many States and localities have enacted laws and regulations which vary from Federal laws and regulations pertaining to the transportation of hazardous materials, thereby creating the potential for unreasonable hazards in other jurisdictions and confounding shippers and carriers which attempt to comply with multiple and conflicting registration, permitting, routing, notification, and other regulatory requirements,
 
 
 18
 (4) because of the potential risks to life, property, and the environment posed by unintentional releases of hazardous materials, consistency in laws and regulations governing the transportation of hazardous materials is necessary and desirable,
 
 
 19
 (5) in order to achieve greater uniformity and to promote the public health, welfare, and safety at all levels, Federal standards for regulating the transportation of hazardous materials in intrastate, interstate, and foreign commerce are necessary and desirable,
 
 
 20
 Hazardous Materials Transportation Uniform Safety Act of 1990, Pub.L. No. 101-615, § 2, 104 Stat. 3244, 3245 (1990). In determining whether the Act preempts the tribal ordinance, we must evaluate whether the ordinance is an obstacle to the accomplishment and execution of these goals.
 
 
 21
 The tribal ordinance requires that anyone seeking to transport "radioactive substances" across reservation land must obtain a transportation license from the tribe. 781 F.Supp. at 613. Thus, each individual shipment requires a separate license. In order to obtain a license, an applicant must apply at least 180 days prior to the proposed shipment, submit a written application providing the details of the proposed shipment "and any other information required in writing by the Tribal Council," and pay a $1,000 application fee. The Tribal Council may deny the application for failure to comply with these requirements or for "other good cause." Id. at 614. The ordinance allows for judicial review of the Tribal Council's decision. Id. Willful violations are punishable by a $1,000,000 civil fine. Id.
 
 
 22
 On its face, the ordinance varies substantially from the Hazardous Materials Transportation Act. The Act does not require a transportation license for individual shipments of radioactive materials. For most shipments, the Act requires no more than notice to the consignee:
 
 
 23
 (c) Prior to each shipment of fissile radioactive materials, and Type B or highway route controlled quantity packages of radioactive materials (see § 173.403), the shipper shall notify the consignee of the dates of shipment and expected arrival. The shipper shall also notify each consignee of any special loading/unloading instructions prior to his first shipment....
 
 
 24
 49 C.F.R. § 173.22(c) (1992). In the case of "irradiated fuel," the Act applies United States Nuclear Regulatory Commission regulations which require that written notice be given to the NRC at least ten days before the shipment. Id.; see also 10 C.F.R. §§ 73.37(b)(1), 73.72(a) (1992).
 
 
 25
 The tribal ordinance subjects all shipments of "radioactive substances" to the license and 180 day pre-notification requirements.[4] These requirements greatly exceed the federal provisions and create the exact inconsistency the Act intends to prevent.
 
 
 26
 In Southern Pacific Transportation Co. v. Public Service Commission, 909 F.2d 352, 358-59 (9th Cir.1990), the Ninth Circuit concluded that the Hazardous Materials Transportation Act preempted a regulatory scheme that was far less intrusive than the tribe's ordinance. The court found that Nevada's regulations "create[d] a separate regulatory regime ... fostering confusion and frustrating Congress' goal of developing a uniform, national scheme of regulation." Id. at 358. Like the tribal ordinance, the Nevada regulations granted broad discretion to the non-federal regulatory body and required that licensed applicants submit "any additional information" that the regulatory body deemed necessary. Id.
 
 
 27
 The Act has also been held to preempt regulations applying pre-notification requirements to shipments other than those of irradiated fuel. See Colorado Pub. Util. Comm'n v. Harmon, 951 F.2d 1571, 1582-83 (10th Cir.1991). The Tenth Circuit found that Colorado's regulations (again less stringent than the tribal ordinance) inhibited and obstructed uniformity "by mandating extensive information and documentation requirements that are likely to confound the transporters of hazardous materials, thereby increasing the potential for unreasonable hazards throughout the country." Id. at 1583. Likewise, in this case, the lengthy pre-notification requirements and unfettered discretionary power to require information from applicants and to deny licenses, create obstacles to the accomplishment of the Act's purpose.
 
 
 28
 We conclude that the Hazardous Materials Transportation Act preempts the tribal ordinance. In resolving to enforce the ordinance, the members of the Tribal Council were acting to enforce an ordinance that the tribe had no authority to enact. The Council members acted beyond the scope of their authority and placed themselves outside of the tribe's sovereign immunity. The district court therefore did not err in concluding that it had jurisdiction over the Council members, and in denying the tribe's motion to dismiss.
 
 
 29
 We further note that the district court had an independent source of jurisdiction arising from the Hazardous Materials Transportation Act. As the tribe acknowledges, Congress has the power to statutorily waive a tribe's sovereign immunity. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978). The Supreme Court pointed out that courts should "tread lightly in the absence of clear indications of legislative intent" when determining whether a particular federal statute waives tribal sovereign immunity. Id. at 60, 98 S.Ct. at 1678. The Court emphasized that "a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.' " Id. at 58, 98 S.Ct. at 1677 (citations omitted).
 
 
 30
 Although the Martinez standard is high, we have no doubt that the language of the Act exceeds it. Indian tribes are expressly subjected to the Act's preemption rules. Every relevant subsection of section 1811 contains the language "state or political subdivision thereof or Indian tribe." See 49 U.S.C.App. § 1811(a)-(d). The Act's plain language indicates that, sovereign immunity notwithstanding, states and Indian tribes are subject to the preemption rules, including the provision that allows preemption cases to be brought in "any court of competent jurisdiction." 49 U.S.C.App. § 1811(c)(2). This language is sufficient to constitute an express waiver of tribal sovereignty.
 
 
 31
 This Court, applying Martinez, found a waiver of tribal sovereign immunity in the Resource Conservation and Recovery Act, which contains far less direct language. See Blue Legs v. United States Bureau of Indian Affairs, 867 F.2d 1094, 1096-97 (8th Cir.1989). Our analysis in Blue Legs rested on comparison of separate provisions in that statute. One section authorized compliance suits against "any person," another section defined "person" to include "municipality," and a third defined "municipality" to include Indian tribes. Id. Reading all these together, we determined that the statute authorized compliance suits against tribes and "clearly indicate[d] congressional intent to abrogate the Tribe's sovereign immunity." Id. at 1097. Here, the Hazardous Materials Transportation Act's language is much more direct and certainly constitutes a waiver of tribal immunity.
 
 
 32
 Finally, the tribe argues that the district court erred in not requiring NSP to exhaust all tribal remedies before proceeding to federal court. The tribe argues that NSP should have gone through the license application process and review. We conclude that the district court did not err. The only remedies are those created in the ordinance itself, and those remedies are void by virtue of the ordinance's preemption. This leaves NSP with nothing to exhaust.
 
 
 33
 We therefore conclude that sovereign immunity does not bar the present action from federal court. The district court did not err in denying the tribe's motion to dismiss.
 
 II.
 
 34
 We next address the tribe's argument that the district court erred in applying the four-factor Dataphase test when it issued the preliminary injunction. See 640 F.2d at 113. "On appeal, we may not disturb the District Court's balancing of the equities absent a clearly erroneous factual determination, an error of law, or an abuse of discretion." West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222-23 (8th Cir.1986), cert. denied, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987).
 
 
 35
 In considering the preliminary injunction, the district judge explicitly applied the Dataphase test:
 
 
 36
 Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.
 
 
 37
 Dataphase Sys., 640 F.2d at 113; see 781 F.Supp. at 616. The district court reviewed evidence presented by NSP which indicated that enforcement of the ordinance (particularly enforcement of the 180 day pre-notification provision) would interfere with the timely shipment of water samples and thus impair NSP's ability to monitor the plant's operations. 781 F.Supp. at 616-17. The court relied in part on the testimony of the plant's general manager that such delays had already begun to occur as a result of the tribe's actions. Id. at 616. The court concluded that, because of these delays and others likely to occur in the future, the enforcement of the ordinance posed a real threat that NSP would suffer irreparable harm. Id. at 616-17. The tribe argues that the district court's conclusion rests on its "undue and unsupported" acceptance of NSP's version of the facts and that the district court ignored the "actual regulatory effect" of the tribal ordinance. The district court's order, however, refers to the tribe's arguments and indicates that the court considered them before making its decisions. Id. at 617. Having reviewed the record, we cannot conclude that the district court's factual determinations were clearly erroneous.
 
 
 38
 The tribe also argues that the district court committed a legal error in its analysis of potential harm. The tribe claims that the court improperly balanced the harms by failing to give it the "necessary presumption of constitutionality." We find no evidence of such a failure. The district court simply assumed that the tribe would enforce the ordinance as written and refused to speculate that the tribe and NSP might someday enter into negotiations and agree upon a less burdensome regulatory scheme.[5] Id. at 616.
 
 
 39
 The district court then balanced the potential harm to NSP against the potential harm to the tribe. Id. at 617. The tribe asserted that the injunction would strip the tribe of its sovereign authority to regulate potentially dangerous activities within reservation boundaries. The district court, however, correctly recognized that the federal statute preempted the ordinance. See id. at 618. Because the ordinance is preempted and is not a legitimate exercise of the tribe's sovereign powers, the injunction against enforcement of the ordinance does not affect the tribe's sovereign power. The tribe remains free to regulate activities within the reservation "for the protection of the health, safety, economic interests, spiritual needs and aesthetic desires of the Tribe." Appellant's Brief at 38. We conclude that the district court's balancing of the potential harms is neither clearly erroneous nor an abuse of discretion.
 
 
 40
 Our earlier discussion of the preemption issue confirms the district court's determination that NSP was likely to succeed on the merits. Likewise, the district court correctly recognized that the injunction would further the public interest by encouraging uniformity in the regulation of radioactive materials and by enhancing the safety of operations at the Prairie Island plant. Id. at 617. In summary, the district court correctly applied the Dataphase test and did not err in issuing the preliminary injunction against the enforcement of the ordinance. See 640 F.2d at 113.
 
 
 41
 We affirm the order of the district court.
 
 
 
 *
 The Honorable Bruce M. Van Sickle, Senior United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 The Honorable Edward J. Devitt, United States District Judge for the District of Minnesota
 
 
 [2]
 The content of these shipments varies considerably. Approximately thirty-five percent are sent by United States mail or United Parcel Service. Many of the shipments contain small samples sent out for analysis or instruments sent out for repair. These shipments emit negligible amounts of radiation. Other shipments contain fuel assemblies which are subject to stricter precautionary measures
 
 
 [3]
 NSP also argues that the tribal ordinance was preempted by the Atomic Energy Act, 42 U.S.C. §§ 2011-2296 (1988). We do not reach this argument because we conclude that the ordinance is preempted under the Hazardous Materials Transportation Act
 
 
 [4]
 The ordinance's definition of "radioactive substances" is exceptionally broad. See 781 F.Supp. at 613 n. 2
 
 
 [5]
 The ordinance authorizes the tribe to enter into such negotiations